Merrimack,
Dec. 3, 1907.

## CURTICE, *Adm'r*, *v.* DIXON.

Where A's expressions of disapproval have been introduced in evidence for the purpose of showing his belief that B, whom he knew intimately for many years, possessed a violent and unreasonable temper, evidence of specific acts of quarrelsomeness on the part of B, occurring in the absence of A and subsequently to his declarations, is admissible as corroborative proof.

Whether evidence is too remote to be of assistance to the jury is a question determinable by the trial court and not ordinarily reviewable upon exception.

The admission of incompetent evidence in disparagement of credibility does not furnish cause for setting aside a verdict, if it was not prejudicial upon that issue and was competent for another purpose for which it was offered.

An objection that a hypothetical question propounded to an expert witness assumed facts not justified by the evidence is waived unless taken at the trial.

A verdict is not set aside for erroneous instruction when it is apparent, upon a reasonable construction of the whole charge, that the jury were not misled thereby.

Where a person of advanced years enters into a contract whereby he disposes of a large portion of his estate in view of approaching death, the question of his mental soundness at the time of the transaction is determinable by the rules which would be applied if the disposition had been by will and his testamentary capacity was the subject of inquiry.

BILL IN EQUITY, to set aside a contract made by Isaac D. Merrill with the defendant, his niece, and to compel the restitution of property transferred thereunder by him to her, upon the ground of his insanity and of her undue influence over him. A jury found, in answer to special questions submitted, that at the date of the contract Merrill was not of sound mind, and that the contract and the conveyance of property to the defendant were procured by fraud and undue influence on her part. There was a decree for the plaintiff. Transferred from the October term, 1906, of the superior court by *Peaslee*, J.

Merrill was over eighty-eight years old when the contract was made, and there was much evidence tending to show that he was afflicted with senile dementia. The plaintiffs in interest and the defendant are his nieces and nephews, and together constituted the residuary legatees named in his will, sharing equally. His will was made some time before the contract in question. He had known all these parties intimately for many years. The defendant

claimed to have been his favorite. This fact the plaintiff denied, and he adduced evidence to the contrary which further tended to show that the defendant is possessed of a violent temper and is inclined to meddle with the affairs of others, which characteristics Merrill disapproved of. The only direct evidence tending to prove that Merrill was informed of the fact that the defendant had a violent temper and was inclined to meddle with the affairs of others was contained in the testimony of one Danforth, a witness for the plaintiff, who testified that on one occasion Merrill said to him: " I do n't like Nettie Dixon. She is always in trouble with somebody. I do n't like her." The only evidence which tended to show that the defendant has a violent temper and is inclined to meddle with the affairs of others was elicited on cross-examination of her husband as to specific acts, occurring some time after the date of the contract and not in Merrill's presence. This evidence was admitted, subject to exception.

The plaintiff was allowed, subject to exception, to introduce a letter written by the defendant to one Ward, her tenant, in which she peremptorily ordered him to replace a certain gate which he had removed from leased premises and found fault with him in other respects, threatening to increase the rent if he did not comply with her demands. Other exceptions taken by the defendant to the evidence and the charge of the court are considered in the opinion.

*William H. Sawyer* and *Streeter & Hollis*, for the plaintiff.

*Martin & Howe* and *Sargent, Remick & Niles*, for the defendant.

1. The defendant's character was in no way in issue or material to any issue in the case. It was, of course, competent to prove that Merrill did not approve of her, as bearing upon the question whether his disposition of his property was so unnatural and unreasonable as to indicate that it was the product of a diseased mind, or the result of fraud or undue influence. His attitude of mind toward her was of course material, and his expressions of approval or disapproval were competent as indicative of that attitude. That he thought her quarrelsome, and disapproved of her for that reason, could properly be proved by his statements to that effect. But the question whether she was or was not in fact of a violent and meddlesome temper has no possible bearing upon the case. The question is, what was his opinion of her, not what was her real character, or what ought his opinion to have been. If he disapproved of her because he thought her quarrelsome, or extravagant, or lazy, or untruthful, she could not meet the force of testi-

mony to that effect by proving that his judgment of her was erroneous; nor can the plaintiff add to the force of his expressions of an unfavorable opinion of her by proof that the opinion was in fact well founded. It is entirely immaterial whether his judgment as to her character was just or unjust. His opinion is material; its grounds are utterly immaterial.

But the evidence in question would not have been competent, even if the defendant's character had been capable of proof, as bearing upon the esteem in which she was held by Merrill. The inquiries to which exception was taken related to specific acts supposed to indicate a violent and quarrelsome character. But character cannot be proved by evidence of specific instances of misconduct; the only legitimate proof of character, collaterally in issue, is reputation. The application of this principle to a witness' bad character for veracity is familiar to all. Its application to proof of character in other respects, though perhaps less familiar, is equally well settled. In fact, it is a principle regarding which it can safely be asserted that there is today no difference of opinion in jurisdictions in which the English common law prevails. 3 Enc. Ev. 35, 36, 40; Underhill Ev. 26; 2 Wig. Ev., ss. 1106, 1131; McKelvey Ev. (2d ed.), ss. 122, 123; 16 Cyc. 1275, 1279; *Moulton* v. *State*, 88 Ala. 116; *King* v. *State*, 65 Miss. 576; *Campbell* v. *State*, 38 Ark. 498; *State* v. *Sterrett*, 71 Ia. 386. The New Hampshire decisions are clear and to the point, and are in perfect accord with the authorities elsewhere. *Hoitt* v. *Moulton*, 21 N. H. 586; *State* v. *Forshner*, 43 N. H. 89; *State* v. *Knapp*, 45 N. H. 148; *State* v. *Lapage*, 57 N. H. 245. See, also, *Commonwealth* v. *O'Brien*, 119 Mass. 342.

2. The cross-examination of the defendant's husband was also objectionable because it related to her conduct at a time when her character could not, on any possible theory, be material. This case was tried at the April term, 1906,—nearly three years after Merrill's death. The inquiries related to the time of the trial. The defendant's conduct or character after Merrill's death certainly could not have been brought to his attention, or affected the esteem in which she was held by him. Exhibitions of the defendant's quarrelsome disposition, if competent evidence of her character at the time of the trial, were utterly incompetent upon the question of her character three years earlier. There is no presumption that a person's character has always been what it is today. A woman unchaste today may have been a model of propriety a few months ago; and a woman who three years ago was gentle, peaceable, a kind mother, and a good neighbor, may, from illness, family troubles, or slander, have become nervous, excitable, suspicious, and quarrelsome. Character, once demonstrated, is presumed to con-

tinue until a change is shown; but there is no presumption that present traits of character have always existed.    State v. Forshner, 43 N. H. 89, 90, and authorities cited.

3. The cross-examination of the defendant regarding the Ward letter was incompetent.    It was introduced for the expressly declared purpose of showing the defendant's character, and its use for that purpose was specifically excepted to; but the statement was not withdrawn, nor did the court explain that the evidence could not be considered for that purpose.    The plaintiff's counsel then stated another ground of supposed competency—that of credibility.

The evidence was incompetent upon character, for the reasons already stated.    If competent for the purpose of disparaging credibility, that fact does not cure the error of its uncorrected admission for an incompetent purpose.    "A verdict is not set aside for the admission of evidence competent for some purpose, and not shown to have been offered or used for a purpose for which it was incompetent."    Head-note to Rogers v. Kenrick, 63 N. H. 335. See, also, Smith v. Morrill, 71 N. H. 409 ; Haskell v. Railway, 73 N. H. 587.    This evidence is shown to have been offered and used for a purpose for which it was incompetent,—so offered because expressly so stated, and so used because the jury were not informed that its use for that purpose was incompetent.

The letter was not competent in disparagement of the defendant's credibility as a witness.    The extent to which evidence tending to disparage credibility may be introduced on cross-examination is within the discretion of the trial court; but that discretion must have something within its scope upon which to operate.    It certainly is not within the discretion of the court to determine how far evidence injurious to the witness, but not tending to disparage his credibility, shall be admitted.    Such evidence is always inadmissible, and its use cannot be justified upon any rational theory of judicial discretion.    2 Wig. Ev., s. 1115 ; Buel v. State, 104 Wis. 132.

The precise question has never been decided in this state; but the limitations of the rule are impliedly recognized in several decisions.    "The question put to the plaintiff's husband was asked for the purpose of disparaging his credibility.    How far justice required the cross-examination should be allowed to go in that direction, was a question of fact to be determined at the trial term." Merrill v. Perkins, 59 N. H. 343.    That is to say, the evidence must have some tendency toward disparaging the credibility of the witness.    How far "in that direction" the cross-examination shall go is discretionary with the trial court; but in that direction it must go.    See, also, Gibbs v. Parsons, 64 N. H. 66.    Whether we

call the question one of discretion or of fact, the result is the same. The question is: How much and how remote evidence, tending to show that the witness is not a reliable source of testimony, shall be received? But the evidence must tend to show that the witness is not reliable. There is no discretionary power to admit disgracing, humiliating, or otherwise prejudicing testimony which has no tendency "in that direction."

There is no possible connection between the letter and the credibility of the witness. The admission of such testimony was obviously beyond the scope of the judicial discretion. The question of fact, whether the evidence in question was material to the credibility of the witness, was erroneously decided, and the error was unquestionably prejudicial.

4. The court told the jury that if the transaction in question was in their judgment "unjust or unreasonable," that was evidence upon the issues of sanity and undue influence; and that if the transaction was in the judgment of the jury unjust or unreasonable to "such an extent as to convince you [them] of the existence of undue influence, or an unsound mind," they were at liberty to decide both questions submitted upon that evidence alone. That erroneous statement was peculiarly adapted to reach and indelibly impress itself upon the minds of the jurors, and to lead them to say: "The defendant, Mrs. Dixon, got too much for the consideration she gave, and the court has told us that we may set the whole transaction aside, and answer both these questions in favor of the plaintiff, if we are convinced that the transaction was unjust or unreasonable."

Perhaps if the charge had been so limited as to make injustice and unreasonableness evidence only in case there was evidence of a confidential relation between the parties, or evidence of fraud, undue influence, or insanity, it might have been sustained; but as it permitted insanity or undue influence to be found from the fact alone that the transaction was unjust or unreasonable, it seems in conflict with *Bedel* v. *Loomis*, 11 N. H. 9, 19, and the cases hereinafter cited, which hold that the fact that the disposition of property is unjust or unreasonable, even to the degree of "outraging common feeling," is "insufficient evidence of itself" to authorize a court or jury to find insanity or undue influence, and that that fact is a circumstance to be considered only in case there is "other evidence on the question of unsoundness or delusion of mind" or undue influence, and then as an "auxiliary influence"— "not a controlling one." *Denison's Appeal*, 29 Conn. 399, 405, 406; *Bitner* v. *Bitner*, 65 Pa. St. 362; *Lamb* v. *Lamb*, 105 Ind. 456, 462; *Kimball* v. *Cuddy*, 117 Ill. 213; *Kevil* v. *Kevil*, 2 Bush 614.

5. The transaction in question was a contract made by Merrill —not his will. The transaction being a contract, there was no occasion for capacity on Merrill's part to know " who his relatives were, and what reasonable claims, if any, they had upon his bounty." The importance of this error, and the fact that it was error, becomes more apparent when we consider the next paragraph of the charge. That paragraph abandons capacity as the test and substitutes conduct in its stead. It says if Merrill " correctly thought out substantially what his property was, recalled to mind his nephews and nieces, and then decided, either from the selfish motive of provided comfort for his remaining days, or from a feeling of generosity for his niece, or perhaps from a mixture of motives, made up his mind to do what he did, then he was of sound mind." Undoubtedly he was of sound mind if he did those things, but he may have been of sound mind if he did none of them. If he had the capacity to do them he was of sound mind, whether he did them or not. This instruction in effect directed the jury to find that Merrill was of unsound mind unless they were satisfied that at the time of the transaction in question he did as a matter of fact recall to mind his nephews and nieces, what claims, if any, they had upon his bounty, and decide as to those claims. As his will, in which he dealt with his nephews and nieces and determined the question of their claims upon his bounty, had already been made, and as this was the disposition of but about a half of his estate and was a contract, it was immaterial whether his mind adverted to his nephews or nieces at all or not; and it seems to have been certainly improper to have given the jury an instruction which would permit them to say : " If Merrill, when he made this contract with Mrs. Dixon, did not ' recall to mind his nephews and nieces '—these plaintiffs—and decide as to their claims upon him, the court has told us we cannot find him to have been of sound mind."

6. The question of the validity of the contract in question was one of mixed law and fact; and the plaintiff's expert alienist, by his answer, assumed to decide not only the fact of insanity, but the law governing a contract made by an insane person. That the expert guessed right as to the law, and answered the mixed question of law and fact correctly, does not render the submission of that issue to him the less erroneous.

The objection to the question and answer is two-fold : (1) The expert was permitted to exercise the function of the jury and decide (without instruction as to the law) a mixed question of law and fact. (2) The expert did not give the jury (or, for that matter, the court) any statement of the facts which he assumed as the basis for his opinion. Both these objections are fully sustained

by the cases we cite. *Fairchild* v. *Bascomb*, 35 Vt. 398; *Hamrick*
v. *State*, 134 Ind. 324; *Illinois Central R. R.* v. *People*, 143 Ill.
434; *Kempsey* v. *McGinniss*, 21 Mich. 123; *Bennett* v. *State*, 57
Wis. 69; *Farrell* v. *Brennan*, 32 Mo. 328.

WALKER, J. The plaintiff claimed at the trial that Merrill was
mentally incompetent to do business at the time of the transaction
in question and that he was unduly influenced by the defendant.
The plaintiff also contended that the sum of $20,000 which Merrill
gave to the defendant under the supposed contract was so exorbi-
tant, in view of the size of his estate and the claims of his other
relatives, that it afforded evidence that he was of unsound mind
or was subject to the control of the defendant. That it might
constitute evidence of that character, when considered in connec-
tion with other evidence bearing upon the questions of his mental
capacity and her influence over him, cannot be denied as a matter
of law. While it might be of little weight, it furnished a logical
basis for the deduction suggested.

In reply to this contention on the part of the plaintiff, the
defendant insisted that she was a particular favorite of her uncle,
and that this fact led him to favor her, to the prejudice of his
other relatives. On the other hand, the plaintiff contended that
she was not his favorite, that he disliked her because of her quar-
relsome disposition, and that this fact tended to prove that he did
not enter into the arrangement with her while in the reasonable
possession of his faculties, uninfluenced by her. The issue, though
a subsidiary one, was clearly presented: Did Merrill dislike the
defendant because he believed she had a violent or unreasonable
temper? If he did, it is not improbable that he entertained toward
her feelings of disapproval or hostility. The defendant's position
that she was her uncle's favorite made this a direct—not a merely
collateral—issue. To prove the affirmative of it, the plaintiff
showed that Merrill had said that he did not like the defendant
because "she is always in trouble with somebody." This evi-
dence, received without objection, had a direct tendency to prove
the plaintiff's contention and was material, particularly as it
appeared that Merrill had known the defendant intimately for
many years and had been in a position to observe her traits of
character. In addition to this evidence, and to strengthen and
corroborate the testimony that Merrill disliked the defendant for
the reason above given, the plaintiff was permitted, subject to
exception, to show specific acts of ill-temper and quarrelsomeness
on the part of the defendant, when Merrill was not present. If
the instances of her quarrels had occurred in the presence of Mer-
rill, they would afford some evidence that he might reasonably

entertain the idea that she was quarrelsome, and hence that he did entertain it. One's actual observation of a transaction is certainly evidence that he believed it took place. Nothing could be more elementary. And as traits of character are indicated and shown by actions, A's belief that B possesses a disposition to quarrel with his associates would be a reasonable belief if he had seen B manifest such a trait by acts or language. But if there was no evidence that A had observed such acts or heard such language on the part of B, and had been in no position where he could acquire a knowledge of B's peculiarities, specific instances of B's violent temper would not tend to show that A entertained the belief. Whether his belief might be proved by the common reputation in which B was held by those who knew him need not be considered; for the point is, not what B's character was as indicated by his reputation, but what did A think or believe it was. One ground on which it could be found that he reasonably might have a belief as to B's character would be the fact of his actual observation of B's acts showing his character; but that is not the only evidence authorizing such an inference.

If the issue had been merely whether the defendant had or possessed a violent temper, specific acts of unreasonable violence on her part would logically tend to prove the affirmative. The fact of her characteristic in this respect would not depend exclusively on her general reputation. A person's reputation and character are not the same. Reputation, as evidence, may tend to prove character; but a man may in fact have a good character while suffering from a bad reputation. *Bottoms* v. *Kent*, 3 Jones L. 160. In this case no attempt was made to prove her character by general reputation. Her general reputation for kindness and patience was not in issue; and much difficulty in determining the question of the admissibility of the evidence of specific acts of ill-temper is avoided by clearly understanding that the evidence was admitted as corroborative proof that her uncle regarded her as a quarrelsome person. If she repeatedly exhibited an unreasonable temper toward people with whom she came in contact, even in the absence of her uncle, the inference would not be unreasonable or illogical that he entertained the belief that she was quarrelsome, based upon his observation of her during his intimate acquaintance with her for many years. If it was shown by specific instances, not occurring in his presence, that as a matter of fact—not as a matter of reputation—she was "always in trouble with somebody," it would be difficult to understand why that fact would not have a logical bearing on the probability of his entertaining a similar idea in regard to her. If it is claimed that A thinks B is a great mathematician, for instance, the fact that he has performed remark-

able feats in that line, though unknown to A, has some tendency to prove that A does think so, after proof of A's long and intimate association with B in scientific pursuits requiring skill of that character.

If the fact that a person has done a particular thing on a single occasion has a tendency to prove he is in the habit of doing it under similar circumstances (*Lyman* v. *Railroad*, 66 N. H. 200; *Smith* v. *Railroad*, 70 N. H. 53; *Tucker* v. *Railroad*, 73 N. H. 132), the fact that he has done it on many occasions must also have such a tendency. *Plummer* v. *Ossipee*, 59 N. H. 55, 59. In fact, the reason evidence of that character is sometimes excluded is not because it is irrelevant to the matter in issue (*Darling* v. *Westmoreland*, 52 N. H. 401, 405, 409), or because there is no logical connection between it and the fact to be proved, but because the evidence has too great a tendency to prove it. In other words, because the evidence has a tendency to excite undue prejudice. 1 Wig. Ev., ss. 55–57. It may be relevant, but inadmissible on other grounds.

Whether a man was negligent in a given situation is provable in this state by evidence of specific acts tending to show his negligent habit. "In this state specific instances of a party's negligence of the same general character of those complained of, and which are not too remote in point of time, may be put in evidence to show his negligence at the particular time, upon the theory that a person is more likely to do a thing in the way he is in the habit of doing it, when he acts thoughtlessly and without an actual intention of injuring any one." *Proctor* v. *Freezer Co.*, 70 N. H. 3, 4. Upon the same theory, it has been held that it may be shown by specific instances that a party rode " her bicycle on the sidewalk near the place of the accident," to prove " that at that time she was occupying that part of the highway." *Kenney* v. *Hampton*, 73 N. H. 45, 46. On the question whether a tree was situated so near the traveled path of a highway as to render the highway at that point defective and dangerous to people traveling thereon, evidence is admissible to show that at various times teams and carriages ran against the tree. *Griffin* v. *Auburn*, 58 N. H. 121. The character of the tree as a dangerous obstruction was proved by specific instances of danger occasioned by it. This case merely followed the decision in *Darling* v. *Westmoreland*, 52 N. H. 401, where it was held that it might be shown that a pile of lumber was likely to frighten horses, by evidence that horses passing it were frightened by it. The absence of the parties to the suit when a particular horse was frightened was unimportant. The character of the lumber pile was not affected by that circumstance. See, also, *Cook* v. *New Durham*, 64 N. H. 419.

In *Whittier* v. *Franklin*, 46 N. H. 23, the vicious character of the plaintiff's horse was shown by evidence of specific acts of viciousness, some of which were not known by the plaintiff. In *Judd* v. *Claremont*, 66 N. H. 418, it was held that evidence that a horse driven by a highway traveler had previously stumbled is competent in an action for damages from a defective highway, without proof that the fact was brought to his knowledge, when it also appears that he had opportunities for becoming informed as to the suitableness of the horse. These, and many other authorities that might be cited, illustrate the general principle that the existence of a particular trait or characteristic in inanimate objects or animals may be proved by instances of its manifestation. If the question is whether a person has the habit of becoming intoxicated, proof that he was frequently in that condition would seem to be specially apt and material, and would tend to prove that his near relatives and associates might have the opinion that he possessed that habit. *Cummings* v. *Nichols*, 13 N. H. 420, 428. The principle is well stated in *Whittier* v. *Franklin, supra* (*p.* 26): " The instructions to the jury as to the proof of the habits of the horse, we think were correct. It was admissible to show that the horse was vicious and unsuitable to use for such purposes, and that might be done by proof of acts not brought to the knowledge of the plaintiff, because it is not the knowledge of the particular acts that was to be brought to his notice, but of the character which those acts denote. It would, therefore, be sufficient, after showing his vicious character, to prove notice by plaintiff's admissions, and by similar acts in his presence."

Upon the issue whether Merrill believed that his niece had an irritable disposition, the fact that she had exhibited the outward manifestations of such a disposition to others would seem to be especially relevant and admissible in proof, when coupled with evidence of his declaration that he had such a belief, presumably based upon his observation of her. 1 Wig. Ev., *s.* 208. Suppose the defendant were an insane person, and her conduct toward her associates and neighbors had been such as to put them in fear of personal violence: it is not easy to explain, on logical grounds, why specific instances of that character would not be admissible evidence to show that her uncle, who had known her intimately during the period of her insanity, feared her, or that testimony that he had said he feared her was probably true. The moral quality of her conduct, as good or bad, does not affect the question of its relevancy to the fact to be proved. Evidence that she is insanely or unreasonably violent in her actions, when shown by a sufficient number of specific instances, logically proves the fact. It is not made plainer, or more obscure, by a consideration

of her moral accountability or of the fact that it is not proved by opinion evidence of general reputation. The question is, not whether she has a good or bad reputation in the community where she lives, but whether she actually has a particular trait which manifests itself in acts of violence. If she does have that trait, there is a natural presumption of fact that her uncle, who had long known her, entertained the idea that she was a woman of a violent temper. It shows that such an idea on his part was at least reasonable, and tends to substantiate the testimony that he said she was always in trouble. If the issue had been whether he thought she was benevolent or affectionate, the moral quality of her acts indicating such a character would not furnish a test of their admissibility, nor would his actual knowledge of their occurrence be essential.

Whatever rules are applied in the admission of character evidence for the purpose of impeachment (*Sargent* v. *Wilson*, 59 N. H. 396), or for the purpose of showing reputation merely (*State* v. *Forshner*, 43 N. H. 89), they are not necessarily applicable to exclude specific instances of one's exhibition of violent action, introduced for the purpose of showing that another probably entertained 'the idea that the former had a violent temper during their long and intimate acquaintance. Nor when used for this purpose can the evidence be excluded on the ground that its admission would authorize the inference that the defendant committed the wrong or crime charged in the suit, from the fact of her having previously done a similar wrong. *State* v. *Lapage*, 57 N. H. 245. The evidence showed merely that on several occasions she had exhibited a violent temper; and it logically follows that her uncle was likely to think she was quarrelsome. That was the natural bearing of the evidence. Whether, if he had that idea, it was in fact correct, and whether upon full investigation it would be found that she did have a violent temper, do not seem to be questions of importance in this case. To show that he might reasonably think she had that character, instances of its exhibition were competent; for the jury might reasonably infer that Merrill had often seen similar instances of excitement on her part, and that to a man of his temperament they would indicate a violent temper, which, as the testimony showed, he disliked. If she was excitable and unreasonable or quarrelsome in her relations with the members of her own family and with her neighbors,—if that was her temperament or disposition when her uncle was not present,—it would be natural to expect her conduct in his presence, or within the range of his observation, would not be materially different. The general characteristics of people do not suffer sudden and radical changes.

Whether the evidence of the defendant's exhibition of temper was too remote to be of use to the jury presents a question of fact determinable by the trial court. The admission of the evidence was based upon a finding by the court that, if competent and relevant, it might assist the jury, though relating to matters somewhat removed in point of time from the principal fact in issue. Ordinarily, the exercise of discretion is not reviewed on exception. *Cook* v. *New Durham*, 64 N. H. 419; *Beckman* v. *Souther*, 68 N. H. 381. Nor is the evidence objectionable as a matter of law because it relates to the events occurring after the principal event or transaction. The defendant's disposition to quarrel after the contract in suit was made, or after her uncle told the witness he disliked her, was as competent as her previous disposition would have been. *Chamberlain* v. *Enfield*, 43 N. H. 356, 360. "A man's trait or disposition a month or a year after a certain date is as evidential of his trait on that date as his nature a month or a year before that date, because character is a more or less permanent quality, and we may make inferences from it either forward or backward." 2 Wig. Ev., s. 1618.

The defendant's claim that the Ward letter was improperly received in evidence, and constituted error on account of which the verdict should be set aside, cannot be sustained. It does not appear how the contents of the letter tended to disparage the credibility of the defendant. She merely insisted that her tenant should refrain from doing certain things which she understood he had no right to do; and in this view the letter was not prejudicial so far as her credibility was concerned. Its admission for that purpose, therefore, was harmless error. But so far as the letter showed that she was unreasonably insistent upon her rights as she conceived them to be, and that she was illustrating her alleged character for quarrelsomeness by seeking trouble with her tenant, it was competent for the reasons above considered. That it might have that tendency under the circumstances cannot be doubted. If the admission of the letter to impeach the defendant's veracity as a witness was harmless error, and if it had a legitimate bearing upon the question of her quarrelsomeness, for which purpose it was also admitted, manifestly no reversible error was committed by permitting the letter to be read in evidence.

The exception to the hypothetical question addressed to the expert cannot be sustained. The record shows that the ground of the objection was that the question required the witness to pass upon the issue which it was the province of the jury to determine. After assuming that a man exhibits certain peculiarities, the question required the witness to give his opinion "as to the capabilities of that individual to transact business that requires the use of

judgment." The reply was, "I should say that that person would not have the capacity to transact business in a way that you have mentioned." The inquiry related to the mental capacity of such a person to do acts requiring judgment and discretion. It did not call for expert opinion as to his ability to make a contract which would be binding in law—a position which seems to be taken by the defendant. It called for the witness' opinion as to the fact of the ability of the supposed person to exercise a reasonable or ordinary judgment in the business affairs of life. The further question, whether, if he lacked that ability, he could or could not make a valid contract, was not submitted to the witness, and he did not answer it. To say that the expert told the jury, in effect, that Merrill did not have the legal capacity to make a binding contract, is to misinterpret the testimony reported in the case and to substitute fancy for fact.

It is further urged that the question assumed facts relating to mental unsoundness which were not justified by the evidence, and that the question should have been excluded for that reason. If this contention is sound, the fact that it was not taken at the trial, where the alleged defect might have been obviated, precludes the defendant from now insisting upon it. The first objection to the question was the one considered in the preceding paragraph. The second was general in its character and did not call the attention of the court to the alleged defect that is now suggested for the first time. Under such circumstances justice requires that the defendant should not be allowed to insist upon the objection. *Carter* v. *Beals*, 44 N. H. 408; *Reagan* v. *Railway*, 72 N. H. 298; *Gendron* v. *St. Pierre*, 73 N. H. 419.

The defendant took several exceptions to the charge and to the refusal of the court to incorporate certain requests in the instructions. One point thus presented is, in the language used in the defendant's brief, that the jury were in effect instructed that "if they thought the transaction unjust and unreasonable, they could from that fact alone find unsoundness of mind, or undue influence, or both." This is an inference based upon a single sentence in the charge, which is as follows: "If the donation is unjust or unreasonable, that fact is evidence for you to consider upon the issues of sanity and undue influence, but it is not of itself a cause for revising what has been done, unless it is of such an extent as to convince you of the existence of undue influence or an unsound mind." It is admitted that in various forms of language, employed both before and after the sentence above quoted, the court instructed the jury correctly on this point. They were told that one in disposing of his property has a right to "disregard all natural ties and every idea of moral obligation, and still be within

his legal rights"; that "the right to dispose of one's property is not dependent upon the condition that the gift shall be reasonable"; that "this transaction here in question is such a one as he [Merrill] could lawfully enter into if he saw fit. And so you will at once dismiss from your minds any idea that this transfer may be set aside merely because it gives one niece a large part of his estate, and address yourselves solely to the task of ascertaining whether this gift or contract was his in fact and in law." Upon a reasonable construction of the charge, it seems plain that the court did not intend to say, and that the jury could not understand they were told, that if they thought the contract unreasonable they might from that fact alone find insanity or undue influence. That the injustice and unreasonableness of the transaction is competent evidence on those issues is conceded in argument; but it is the special unreasonableness found to exist under all the circumstances of the case relating to Merrill in his disposition of his property, and not what the jurors might think would be unreasonable for men in general to do under like circumstances, that was intended in the sentence quoted from the charge. In view of his purposes, peculiarities, prejudices, and other special considerations influencing his conduct as a sane and free moral agent, one question for the jury would be whether the transaction in question was reasonable; that is, whether it was naturally to be expected, or whether it was so in conflict with his known disposition and purposes as to be unnatural and unexplainable, or unjust and unreasonable, from his point of view when sane and subject to no undue influence. If the single remark of which complaint is made is susceptible of the construction given it by the defendant, and if that statement of the law is incorrect, it does not follow that the jury disregarded the other parts of the charge bearing on the same subject and rendered their verdict because of the erroneous remark. It does not plainly appear that they were misled thereby, or that they were likely to adopt the erroneous construction suggested. "Taken as a whole," it is not apparent "that the charge was very liable to lead the jury to this erroneous conclusion." *Cohn* v. *Saidel,* 71 N. H. 558, 571; *Lord* v. *Lord,* 58 N. H. 7, 11; *Cooper* v. *Railway,* 49 N. H. 209.

The court further instructed the jury, that "to be of sound mind within the meaning of the law and for the purposes of this transaction, he [Merrill] must have had a sufficient mental power to understand the nature and extent of his property, who his relatives were, and what reasonable claims, if any, they had upon his bounty"; that "if his mind was . . . practically gone, if . . . he was incapable of consecutive thought, or if he could not think at all except as some one matter was sharply thrust

upon his attention,  .  .  .  then he had not the mental capacity which is required"; and that "to sum it all up in a few words: Did he know what he was about? That is the essence of the test of sanity: Did he know what he was about?" It is objected that if this instruction is correct in determining a testator's capacity in disposing of his property, it is not applicable when the question of capacity relates to a contract, as in this case. But one theory of the plaintiff's case was, that though the transaction took the form of a contract, which was executed, it was in effect a disposition of a large part of Merrill's estate in view of his great age and approaching death. In this view, the instructions were correct.

It is believed that the foregoing substantially covers all the numerous exceptions argued by the defendant; and as no error is found, the order must be,

*Exceptions overruled: judgment on the verdict.*

All concurred.