Coös,
June 29, 1933.

WALTER G. CHATMAN *v.* MAINE CENTRAL RAILROAD.

*Bernard Jacobs,* (by brief and orally), for the plaintiff.

*Irving A. Hinkley,* (by brief and orally), for the defendant.

BRANCH, J. 1. In support of its motion for a directed verdict the defendant takes two positions, (a) that there was no evidence of its negligence, and (b) that the plaintiff's assumption of risk was conclusively established. Neither of these positions can be maintained.

(a) Upon August 9, 1930, the plaintiff was employed by the defendant as a car inspector and was injured while operating a machine known as a jointer and commonly called a "buzz planer," in the defendant's car shop at Lancaster. He was an experienced operator of such machines and no claim of failure to warn or instruct him was advanced at the trial. The accident happened when a piece of plank which he was planing suddenly "kicked back" and caused his left hand to come in contact with the revolving knives of the machine.

The plaintiff's expert testified that a planer of this type should be installed so as to run at a speed of 4000 revolutions a minute and that this is the minimum speed for the safe operation of a belt driven machine; that when the speed "drops down to approximately 1800 or 2000 revolutions per minute . . . the knife no longer cuts but strikes, and when it strikes it throws the piece of wood that's being finished, backwards in the direction from which it came." The gist of the expert's testimony was that a speed of 4000 revolutions per minute when the planer is running idle should be provided, in order to allow a sufficient margin of safety for variations in speed under load above the "critical speeds" of 1800 to 2000 revolutions.

Tests of the planer in question made a year and a half after the accident indicated that it was speeded to only 2850 revolutions per minute. Moreover, considerable variations in the speed of the steam engine by which it was driven were expectable because this engine was located at the end of a steam pipe line approximately 386 feet long, upon which were installed a considerable number of intermediate outlets leading to other machines in the defendant's plant. If it were found that the planer in question was installed to run at a speed considerably below the safe minimum of 4000 revolutions per minute, a conclusion that the defendant was negligent in this respect would clearly be permissible.

The defendant argues, however, that the results of tests made a year and a half after the accident furnished no substantial basis for such a finding. In answer to this argument it is sufficient to say that the question whether evidence of events somewhat removed in point of time from the occurrence in question may assist the jury in determining the principal issue is one of fact for the presiding justice to decide and that his conclusions upon such questions are not ordinarily reviewable here. *Curtice* v. *Dixon*, 74 N. H. 386, 397; *Mason* v. *Railway*, 79 N. H. 300, 304; Hening, N. H. Dig. 586. It may be pointed out, however, that there was testimony to the effect that the conditions under which these tests were made were substantially the same as those which prevailed at the time of the accident; that the evidence went in without objection and that the defendant appeared to concede the probative value of such experiments by introducing evidence of other tests made by its own experts at a still later time.

The defendant's contention that the evidence was insufficient to sustain a finding that the speed of the planer caused or contributed to the injury of the plaintiff is without merit. The plaintiff testified that there was a sharp drop in the steam pressure from 65 to 35

pounds at the engine in the car shop which he observed immediately after the accident. There was evidence that such a drop would cause a considerable loss of engine speed before the condition could be corrected by the action of the governor, and that a corresponding decrease in the speed of the planer was calculated to produce exactly the result which followed.

(b) The foregoing considerations also indicate the answer to the claim of the defendant that the plaintiff assumed the risk from which his injury resulted. It is axiomatic that a servant does not assume any risks which might be obviated by the exercise of reasonable care on the master's part, unless he is chargeable with knowledge of the master's failure to perform this duty. 3 Labatt, M. & S. (2d *ed.*) *ss.* 894, 1178; *Maltais* v. *Concord, ante,* 211 and cases cited. There is no suggestion in the record that the plaintiff knew or had reason to know of the actual speed of the planer and, therefore, it cannot be said, as a matter of law, that he assumed the risk incident to the improper installation of the machine.

2. During the examination of an expert witness, plaintiff's counsel propounded a hypothetical question in which the witness was asked to assume that while the planer was being operated the power "suddenly dropped so that it caused the planer to slow up." Objection having been made upon the ground that "there is no evidence in the case that the planer slowed up" the question was admitted upon the agreement of plaintiff's counsel that he would "supply in the morning evidence as to the effect of cutting down [the steam pressure] from 65 to 35 pounds." This evidence was subsequently supplied and defendant's exception to the admission of the hypothetical question must, therefore, be overruled.

3. The defendant produced at the trial a piece of plank which it claimed was the one upon which the plaintiff was working at the time of the accident. The plaintiff denied that this was so and considerable testimony was introduced as to the significance of certain diagonal marks near one end of this exhibit. During the course of his argument to the jury, plaintiff's counsel stated that the defendant claimed these marks to have been made "when they were starting the plank on to the knives" and continued as follows: "Mr. Whitcomb tells you that if that had been done in that way at that time the cut would have come on the end. Of course that must be so; that must be perfectly apparent. A buzz planer doesn't start from a very small distance here to a half or three quarters of an inch, Gentlemen." The following proceedings then took place: "*Mr. Hinkley:* Now if

your Honor please, Mr. Whitcomb testified that if a plank was put on to the planer and not put on straight that that's just what you would get. *Mr. Jacobs:* He didn't testify to any such thing. *Mr. Hinkley:* If the statement is allowed to stand I want an exception to it. *The Court:* Note the exception."

An examination of the record indicates that the witness Whitcomb did give it as his opinion that if the mark near the end of the plank "had been made when that was shoved first against the knife the cut would have been straight across the edge of it." The argument of plaintiff's counsel was, therefore, proper, although the same witness, upon cross-examination, stated that if the plank were not put straight on the planer it would cause a diagonal gouge "instead of one straight across."

Defendant now argues, however, that "plaintiff's counsel made the direct statement that the witness did not testify to what the records show he did testify to." In other words, defendant now seeks to bring within its exception the assertion of plaintiff's counsel that the witness "did not testify to any such thing." The language of the record will hardly bear this construction, but we need not labor this point, for the trial court instructed the jury as follows: "You have heard the testimony of the witnesses, and it is for you, and you alone, to say what that testimony was. Taking your recollection of that testimony you should weigh it carefully, and considering the probabilities, what was more likely to have happened, determine what the facts are." This instruction cured any misstatements of counsel. *Carr* v. *Orrill, ante,* 226 and cases cited.

*Judgment on the verdict.*

WOODBURY, J. did not sit: the others concurred.